**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

BARBARA A. TOYE,        )
                                  )
                    Plaintiff,   )
                                  )     **MEMORANDUM OPINION**
    v.                           )     **AND RECOMMENDATION**
                                  )
MICHAEL J. ASTRUE,       )        1:08CV00328
Commissioner of Social Security,  )
                                  )
               Defendant.  )

       Plaintiff, Barbara A. Toye, brought this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for a period of disability and Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Social Security Act (the "Act").  The parties have filed cross-motions for judgment, and the administrative record has been certified to the court for review.

**Procedural History**

       Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")[1] on August 2, 2004 (protective filing date, July 22, 2004), with an alleged onset of disability ("AOD") of August 2, 2002.  Tr. 44, 54; see also Tr. 17.  The applications were denied initially and upon reconsideration.

---

[1]   Plaintiff's SSI application is not included in the transcript.

Tr. 34, 40.  Plaintiff requested a hearing de novo before an Administrative Law Judge (ALJ).  Tr. 43.  Present at the hearing, held on January 18, 2007, were Plaintiff, her attorney, and a vocational expert (VE).  Tr. 331.

By decision dated April 12, 2007, the ALJ determined that Plaintiff was not disabled within the meaning of the Act.  Tr. 17.  On March 10, 2008, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, Tr. 4, thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review.

In deciding that Plaintiff is not entitled to benefits, the ALJ made the following findings, which have been adopted by the Commissioner:

• Plaintiff met the insured status requirements of the Act through December 31, 2007.  Tr. 19.

• Plaintiff had not engaged in substantial gainful activity since her AOD.

• Plaintiff's degenerative disc disease of the lumbar spine ("DDD") and dextroscoliosis (scoliosis with convexity on the left side) were, in combination, "severe," as defined in 20 C.F.R. sections 404.1520(c) and 416.920(c).

• Plaintiff had neither an impairment nor combination of impairments that either met or medically equaled an impairment specified in 20 C.F.R. Part 404, Subpart P, Appendix 1 (hereinafter, the "Listings").  Tr. 20.

• Plaintiff had the residual functional capacity ("RFC") to perform "sedentary" work.  Tr. 21, 24.

• Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were not "entirely credible."  Tr. 22.

• Plaintiff was unable to perform her past relevant work.  Tr. 23.

2

The ALJ added that Plaintiff, born on May 12, 1955, was forty-seven years old at her AOD, regulatorily defined as "closely approaching advanced age." Id. (citing 20 C.F.R. §§ 404.1563 and 416.963). Plaintiff has at least a high school education, and can communicate in English. The ALJ found that transferability of job skills was not an issue in the case. Based on these factors and Plaintiff's RFC, the ALJ relied on Rule 201.22 of the Medical-Vocational Guidelines to find that Plaintiff was not disabled from her AOD through the date of his decision. Tr. 23-24 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2).

## Analysis

In her brief before the court, Plaintiff argues that the Commissioner's findings are in error because the ALJ erred in his assessment of (1) medical opinions, (2) whether she met a Listing, (3) her credibility, and (4) her RFC. The Commissioner contends otherwise and urges that substantial evidence supports the determination that Plaintiff was not disabled.

## Scope of Review

The Act provides that, for "eligible"[2] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

> to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to
> result in death or which has lasted or can be expected to last for a
> continuous period of not less than 12 months[.]

---

[2]   Eligibility requirements for DIB are found at 42 U.S.C. § 423(a)(1), and for SSI at 42 U.S.C. § 1382(a).

3

42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).[3]

To facilitate a uniform and efficient processing of disability claims, the Social Security Administration ("SSA"), by regulation, has reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must determine whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals a Listing, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing any other work. Section 404.1520.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. Richardson v. Perales, 402 U.S. 389 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is

---

[3] The regulations applying these sections are contained in different parts of Title 20 of the Code of Federal Regulations (C.F.R.). Part 404 applies to federal old-age, survivors, and disability insurance, and Part 416 applies to supplemental security income for the aged, blind, and disabled. Since the relevant portions of the two sets of regulations are identical, the citations in this report will be limited to those found in Part 404.

evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational.  Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

Issues

1.  Medical Opinions

Plaintiff complains that the ALJ erred in his assessment of the opinions of two of her caregivers, arguing that they were her "treating physicians" and, therefore, their opinions "are entitled to controlling weight."  Pl.'s Br. at 2.  SSA regulations require that all medical opinions in a case be considered.  Section 404.1527(b).  All "medical source" opinions, regardless of its giver, are evaluated:

> pursuant to the following non-exclusive list:  (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist.  20 C.F.R. § 404.1527 (2005). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. [Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001)].

Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (footnote omitted). But although the regulations require all medical opinions be considered, "treating physician" opinions are accorded special status. See section 404.1527(d)(2). "Courts typically 'accord greater weight to the testimony of a treating physician because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant.'" Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006) (quoting Johnson, 434 F.3d at 654 (internal citation omitted)).

A treating physician – or "treating source" – however, can only be an "acceptable medical source." See section 404.1502. And as Defendant points out, Daniel Redfern, who opined as to Plaintiff's limitations, is not an "acceptable medical source" under the regulations. See, e.g., Tr. 257, 276. See also section 404.1513(d)(1). Because Redfern is not a medical doctor, he is not a medical source whose opinion is entitled to controlling weight under the regulations. See also Social Security Ruling (SSR) 96-2p, 61 Fed. Reg. 34490-01, 34490 (opinions from sources other than "treating sources" (as defined in section 404.1502) can never be entitled to "controlling weight").

Ruling 06-03p, 71 Fed. Reg. 45593, instructs fact finders on how to evaluate opinion evidence from non-acceptable medical sources, explaining that the factors listed in Section 404.1527(d), applicable to acceptable medical sources, are also to be applied to "other source" opinions. SSR 06-03p, 71 Fed. Reg. at 45595. The whole of the ALJ's assessment reads that Redfern's opinion "cannot be given

6

controlling weight since [Redfern's] conclusion is not consistent with the treatment notes and objective medical findings." Tr. 22. Obviously, the ALJ failed to "build an 'accurate and logical bridge from the evidence to [his] conclusion' so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." Scott v. Barnhart, 297 F.3d 589, 595 (7th Cir. 2002) (quoting Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002)). The court thus agrees with Plaintiff that the ALJ's decision does not adequately perform the required analysis.

The ALJ's error in this case, however, is harmless. Redfern opined first that Plaintiff could, at any one time, lift no more than ten pounds and stand no longer than an hour. Tr. 277. At a later date, he added that she should not sit or stand for longer than thirty to forty-five minutes at a time. Tr. 287. Although the ALJ did not include all of these limitations in his RFC finding, he presented to the VE a hypothetical claimant who, inter alia, "could sit for 40 minutes, stand for 15 minutes, walk for 10 to 15 minutes, lift 10 pounds." Tr. 354. Cf. § 404.1566(e) (authorizing the use of VES to provide vocational information). The VE responded with a significant number of jobs in the national economy which such a claimant could perform. Cf. Hicks v. Califano, 600 F.2d 1048, 1051 n. 2 (4th Cir. 1979) (as few as 110 jobs may constitute a significant number); Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997) (650 jobs in state and 30,000 jobs nationwide were a significant number); Trimiar v. Sullivan, 966 F.2d 1326, 1330-32 (10th Cir. 1992) (650-1,000

7

jobs in state were a significant number).   Thus, even if the ALJ had incorporated

Redfern's restrictions into his RFC finding, the ALJ would have satisfied the

Commissioner's step five burden.  See § 404.1560 (placing the step five burden

upon SSA). Cf. Heston v. Commissioner, 245 F.3d 528, 536 (6th Cir. 2001) (holding

failure to address treating source's opinion harmless error when the ALJ adopted the

treating source's recommendations).

Plaintiff also complains about the ALJ's assessment of Dr. Charles Griffith's

opinion.   Plaintiff avers that all of the physicians at the Veterans Administration

Medical Center ("VAMC"), where she receives her care, are her "treating

physicians," Pl.'s Br. at 2, but she is mistaken.  The regulations define a "treating

source" as an "acceptable medical source . . . who has, or has had, *an ongoing

treatment relationship with you*."   *Section 404.1502 (emphasis added).*  There is no

indication in her medical records that Plaintiff saw Dr. Griffith more than once, and,

thus, there is no mandate to accord his opinion controlling weight.  Simply because

Dr. Griffith had access to Plaintiff's records does not afford him this status; if that

were the case, a consultative expert who conducted an examination on SSA's behalf

could be deemed a "treating physician"!

Dr. Griffith opined that, because of Plaintiff's "pain and limited mobility," she

would be "u[n]able to carry [on] activities that require prolonged sitting or standing

as well as lifting."  Tr. 293.  But as discussed above, the ALJ's hypothetical claimant

was required to perform none of the precluded activity.  Moreover, Dr. Griffith's

opinion specified that it was "[a]t this time" and, at that time, Plaintiff was recovering from a recent ankle fracture.  See id.  On the whole, the court finds that the ALJ's assessment of caregiver opinions fails to provide a reason for remand.

Plaintiff also complains that the ALJ erred when he "agree[d] with the opinion of the Medical Consultants of the Disability Determination Service,[4] that the claimant has no evidence of any impairment severe enough to prevent her from performing all types of work activities."  Tr. 23 (footnote added).  Plaintiff's argument appears to misconstrue the ALJ's statement, in that she alleges that it "is inconsistent with the rest of the decision."  Pl.'s Br. at 11.  But the ALJ's statement essentially re-words his conclusion that Plaintiff was not "under a disability within the meaning of the [Act]."  Tr. 17.  See, e.g., 42 U.S.C. § 423(d)(1)(A) (defining disability under the Act).  Thus, the ALJ's finding that Plaintiff could not perform her past relevant work; could lift no more than  ten pounds at a time; and  could walk or stand no more than two

---

[4]    The initial disability determination is made by a state agency acting under the authority and supervision of the Commissioner.  42 U.S.C. § 421(a); § 404.1503(a).  Ruling 96-6p, 61 Fed. Reg. 34466-01, explains that the state agency medical and psychological consultants "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."  Id. at 34467.  Paragraph (f) of section 404.1527 provides that findings of fact by these consultants become "opinions" at the ALJ and Appeals Council levels of administrative review.  SSA requires that, because the consultants are experts in its disability programs, the ALJ must consider and evaluate these opinions in making a decision.

hours in an eight-hour day is *not* inconsistent with a finding of "not disabled," as the ALJ, with these findings, decided that Plaintiff *could* perform "sedentary"[5] work.

Not even the medical consultants, as stated by Plaintiff, found that she "could perform 'all types of work activities,'" Pl.'s Br. at 8; rather, they opined that Plaintiff was limited to "light" exertional work.[6]  <u>See</u> Tr. 135, 178.  To be sure, the ALJ agreed with the consultants only to the extent that they did not find Plaintiff to be disabled, as the ALJ found Plaintiff to be capable of just sedentary work.[7]  Hence, Plaintiff's claim here is without merit.

---

[5]  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

Section 404.1567(a).

[6]  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

Section 404.1567(b).

[7]  The court notes that not even Redfern or Dr. Griffith opined that Plaintiff was precluded from all work activity.  <u>See especially</u> Tr. 325.

## 2. The Musculoskeletal Listings

Plaintiff contends that "it is quite clear" that her impairments meet the Listings at 1.00.2b(1) and 1.00.2(b)(2)d. Pl.'s Br. at 6. The Listings[8] "is a catalog of various disabilities, which are defined by 'specific medical signs, symptoms, or laboratory test results.'" Bennett v. Sullivan, 917 F.2d 157, 160 (4th Cir. 1990) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990)). When a claimant satisfies a Listing by meeting all its specified medical criteria, he presumably qualifies for benefits. See id. See also section 404.1525(a).

SSA has explained how to use the Listings, stating:

(1) Each body system section in parts A and B of appendix 1 is in two parts: *an introduction, followed by the specific listings.*

(2) The introduction to each body system contains information relevant to the use of the listings in that body system; for example, examples of common impairments in the body system and definitions used in the listings for that body system. We may also include specific criteria for establishing a diagnosis, confirming the existence of an impairment, or establishing that your impairment(s) satisfies the criteria of a particular listing in the body system. . . .

(3) *The specific listings follow the introduction* in each body system, after the heading, Category of Impairments. Within each listing, we specify the objective medical and other findings needed to satisfy the criteria of that listing. We will find that your impairment(s) meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement (see section 404.1509).

---

[8]    Although the Listings are contained only in part 404, SSA incorporated them by reference in section 416.925. 64 Fed. Reg. 46122, 46123.

Section 404.1525(c) (emphases added).

Thus, Plaintiff's argument refers to the *introduction* section of the Listings for the Musculoskeletal System. The specific Listings under this body system do not begin until 1.01, entitled "Category of Impairments, Musculoskeletal." Accordingly, Plaintiff's Listings argument has no merit.

3. Credibility

Plaintiff disagrees with the ALJ's finding that her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." Tr. 22. She argues that the ALJ failed to recount how her pain affected her ability to engage in activities of daily living. Yet the ALJ did summarize Plaintiff's testimony that she had numbness and stiffness in her legs, with radiation into her knee and foot. Tr. 22. He referred to her testimony that she could sit no more than thirty minutes, stand no more than five minutes, or walk no more than ten to twenty minutes before having pain. The ALJ added Plaintiff's statement that her knee would give out and cause her to fall. The court finds that this review is sufficient to approximate the effects alleged.

Plaintiff also complains that the ALJ failed to include the observations of a state agency employee that, during her interview, Plaintiff seemed uncomfortable sitting; sat on the edge of her chair and shifted frequently; and stood up a few times to stretch and walk around. Tr. 67. Although the ALJ did fail to discuss this statement, he included his own observations of Plaintiff's sitting behavior: "[T]he

claimant sat in the hearing for 58 minutes without any apparent difficulty." Tr. 22.

See SSR 96-7p, 61 Fed. Reg. 34483-01, 34486 (providing that the adjudicator may consider his "own recorded observations of the individual as part of the overall evaluation" of the claimant's credibility). Clearly, Plaintiff felt no need to engage in any of the same demonstrations during her hearing, even when encouraged to do so by the ALJ, see Tr. 335, and the ALJ's observation thereof is due "great weight," see Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The better practice may have been for the ALJ to include the contrary information, but such deficit alone does not amount to reversible error. See, e.g., Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005) (the ALJ is not required to evaluate every piece of testimony and evidence); accord Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003); Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000).

Relying mostly on her subjective statements, Plaintiff further contends that the ALJ failed to adequately evaluate her pain complaints. The ALJ, however, may discount a claimant's subjective complaints of pain based on credibility determinations. Johnson, 434 F.3d at 658. Under Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996), subjective complaints are evaluated in two steps. First, there must be documentation by objective medical evidence of the presence of an underlying impairment that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. When this underlying impairment is deemed established, the fact finder proceeds to the second step: consideration of the entire

13

record, including objective and subjective evidence, to assess the credibility of the severity of the subjective complaints. <u>See also</u> section 404.1529(b); SSR 96-7p, 61 Fed. Reg. at 34484-85.

At the second step, Ruling 96-7p advises the fact finder to consider medical signs and laboratory findings; medical opinions provided by medical sources; and statements about the claimant's symptoms and their effect on the claimant's ability to work. <u>Id.</u> at 34486. This the ALJ did. <u>See</u> Tr. 19-20, 22. The Ruling also provides for consideration of the following factors: the claimant's individual activities; the location, duration, frequency, and intensity of her pain or other symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication; non-drug treatment that the claimant has received for relief of symptoms; any measures other than treatment the claimant has used to relieve symptoms; and any other factors concerning the claimant's limitations and restrictions due to her symptoms. 61 Fed. Reg. at 34485 (citing section 404.1529(c)(4)).

There is clearly sufficient evidence, utilizing these factors,[9] to support the ALJ's credibility finding.[10] As to Plaintiff's activities, the record contains a "Report of

---

[9] Although Plaintiff alleges error in the ALJ neglecting these factors, the court notes that, aside from citing her own testimony, neither did she utilize them to support her argument.

[10] "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead (continued...)

14

Contact" which describes Plaintiff's move, with the aid of a friend, from Florida to North Carolina.  See Tr. 89.  Her friend stated that Plaintiff "did not have any problems [with] the long ride back to NC," even taking her turn driving.  Id.  She added that Plaintiff had "an active social life."  Id.  Plaintiff wrote that she cooked daily, cleaned and did laundry, drove, and shopped weekly.  Tr. 99-100.  She socialized often, including meeting friends for lunch each month.  Tr. 101.  See Johnson, 434 F.3d at 658 (noting that pattern of claimant's routine activities was inconsistent with plaintiff's complaints); Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) ("The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life.").

As to Plaintiff's medical records,[11] on only one occasion, and not until a physical therapy assessment in August 2005, did Plaintiff contend that her pain was constant.  See Tr. 296.  Even then, she said that medication, heat, and rest helped.  Cf. Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (if symptoms are, or can

_____

[10](...continued)
to a different result."  Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989), quoted in Shkabari v. Gonzales, 427 F.3d 324, 328 (6th Cir. 2005), Cruz-Funez v. Gonzales, 406 F.3d 1187, 1191 (10th Cir. 2005), and Federal Express Corp. v. Mineta, 373 F.3d 112, 118 (D.C. Cir. 2004).

[11]   The following review of Plaintiff's medical records refers only to those visits which mention either her back or her knee impairments.  Plaintiff saw caregivers related to her Sjogren's syndrome and her depression, but she did not allege disability from either of these.  See, e.g., Tr. 59-60.  The ALJ found Plaintiff's "lupus" (not substantiated by the record), Sjogren's syndrome (see n. 16, infra), inactive thyroid, and depression all to be non-severe, Tr. 20; Plaintiff has not challenged these findings.  Further, Plaintiff testified that she was unable to work "[m]ainly because of my back pain and my limitations."  Tr. 339.

be, reasonably controlled by medication, they may not be considered disabling under the Act). Plaintiff's first medical record, in August 2002 (after her AOD), placed her back pain at only a three on a ten-point scale. Tr. 246. There was no other pain complaint. Straight-leg testing was negative, and Plaintiff exhibited good strength; she received a prescription for Naproxen.[12] Cf. Shively v. Heckler, 739 F.2d 987, 990 (4th Cir. 1984) (the weakness of pain medication is a factor to be considered in assessing the severity of a claimant's pain).

The reason stated for Plaintiff's next visit, some three months later, was "to get established with somebody to know her [history]." Tr. 221. Her review of symptoms included a few month history of non-radiating low back pain, with some relief with her "current" treatment. Tr. 222. Plaintiff placed her pain at zero. Tr. 223. Her only finding on exam was some tenderness to palpation. Tr. 224. The doctor listed, among Plaintiff's diagnoses, lower back pain, myofascial type, and prescribed a back brace. Tr. 225-26.

Plaintiff's next visit does not appear to be until March 2003, another four months later. She reported intermittent right leg numbness, but only when in a position for a long period, and more back pain. Tr. 199. Plaintiff's findings on exam, however, were good, Tr. 200, and a knee x-ray was normal, see Tr. 180. See also SSR 96-7p, 61 Fed. Reg. at 34487 ("A report of negative findings . . . is one of the

---

[12] Naproxen, available over-the-counter, is a nonsteroidal anti-inflammatory drug ("NSAID") indicated, inter alia, for the relief of the signs and symptoms of osteoarthritis. Physicians' Desk Reference 2632-33 (63d ed. 2009) [hereinafter, the "PDR"].

16

many factors that appropriately are to be considered in the overall assessment of credibility."). When she consulted with the Rheumatology Clinic the following month, Plaintiff rated her pain at only one. Tr. 199.

There is no record that Plaintiff sought any treatment for complaints of pain from March 2003 through June 2004. See Mickles, 29 F.3d at 930 ("[A]n unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition is highly probative of the claimant's credibility."). Cf. SSR 96-7p, 61 Fed. Reg. at 34487 (claimant's persistent attempts to obtain pain relief support allegations of intense symptoms). It was at her June 2004 visit that Plaintiff first saw Redfern, who became her primary care provider. See Tr. 282. Although her x-rays revealed significant degenerative changes and significant dextroscoliosis, Tr. 251, Plaintiff was taking just Naproxen for pain, see Tr. 259. A study of her right knee revealed merely mild osteoarthritis. Tr. 249. Plaintiff was not deemed to be a candidate for surgery. Id. The only finding on examination was some tenderness on the spine. Tr. 283.

When Plaintiff returned to Redfern in July for new prescriptions, he changed her Naproxen to diclofenac.[13] Tr. 279. She was back in August, and, although she complained of increased back pain, it was at this visit that Redfern first opined as to

---

[13] Diclofenac, also an NSAID, is also indicated, inter alia, for the relief of the signs and symptoms of osteoarthritis. PDF at 2334.

17

Plaintiff's limitations, in connection with her application to vocational rehabilitation. Tr. 277. Plaintiff told Redfern that the diclofenac helped, but she still had break-through pain. Redfern changed her prescription again, to Fioricet,[14] and encouraged Plaintiff to exercise.

The reason for Plaintiff's next visit, in September, was given as "further evaluation of knee and back condition," but she asked Redfern for a statement "about what has caused her back and knee [problems]" for submission to "DAV" (Disabled American Veterans). Tr. 276. His only diagnosis at this visit was "dysthmia [sic],"[15] and he advised Plaintiff to consult with the mental health clinic. Id.

Plaintiff again went several months between pain visits, not returning to Redfern until March 2005. See Tr. 287. Redfern's only applicable comments were that Plaintiff "continues to need fioricet and diclofenac for back pain," and to describe

_____

[14]  "Fioricet is a preparation of acetaminophen, butalbital and caffeine; butalbital is a short- to intermediate-acting barbituate used as a sedative in combination with an analgesic in the treatment of tension or migraine headache." Fernandez v. Astrue, 2009 WL 961492, 3 n. 2 (N.D.N.Y. Apr. 7, 2009) (citations omitted).

[15]  "Dysthymia" is described as a "chronic mood disorder manifested as depression for most of the day." Stedman's Medical Dictionary 602 (28th ed. 2006) [hereinafter, "Stedman's"].

her limitations.  Id.  He added that Plaintiff would be seen in the Rheumatology Clinic for her Sjogren's syndrome.[16]

Plaintiff's appointment with Rheumatology was on June 3, 2005.  See Tr. 290. Her Sjogren's syndrome was stable, and it was noted that osteoarthritis of her knees and back was her "most consistent problem."  Id.  Plaintiff complained of numbness down her right leg and "a lot of catching and locking of the knee."  Id.  She added that pain and weakness in the right leg caused it to "give away."  Tr. 291.  Although Plaintiff said that she was on Vicodin, there was no record of this prescription.  See Tr. 290-91.  Plaintiff had a positive straight leg test on the right, but no joint laxity in her right knee.  She was advised to return to the Clinic in five to six months.  Tr. 290.

Plaintiff followed this visit with an orthopedic consultation the next month.  See Tr. 288.  She complained that "her entire [right lower extremity] hurts," of right leg tingling, and of lower back pain.  Id.  Plaintiff added that her right leg gave way without warning and she fell a lot, but she experienced no locking.

On examination, Plaintiff was found to have a mildly antalgic gait, good knee motion, and only a mild valgus alignment.  Tr. 288.  Her patellar tracking was good, although she had two-plus crepitus; there was no effusion.  Plaintiff's deep tendon reflexes were three-plus, there was no clonus, and her toes were down-going.  Her

---

[16]  "[K]eratoconjunctivitis sicca, dryness of mucous membranes, telangiectasias or purpuric spots on the face, and bilateral parotid enlargement; seen in menopausal women and often associated with rheumatoid arthritis, Raynaud phenomenon, and dental caries; there are changes in the lacrimal and salivary glands resembling those of Mikulicz disease." Stedman's at 1914.

right knee x-rays showed only a mild narrowing of the medial knee compartment and were otherwise unremarkable, with the patella well-aligned in the notch. See SSR 96-7p, 61 Fed. Reg. at 34487. The caregiver noted that Plaintiff was working with Vocational Rehabilitation. Tr. 289. Cf. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (seeking work and working at a job while applying for benefits, are activities inconsistent with complaints of disabling pain).

Reporting for a record fourth visit in as many months, Plaintiff went to a physical therapy evaluation on August 2, 2005. See Tr. 295. The reasons listed for her referral were quadricep strengthening, weight loss, and painful chronic bursitis.[17] The VAMC computer showed that Plaintiff was taking medication only for her Sjogren's syndrome. Plaintiff placed her low back pain at an eight to nine, and her right knee pain at three to four, but her only finding on examination was tenderness to palpation. Tr. 296. She reported that she treated her pain with medication, heat, and rest, which helped some. Plaintiff's trial with a TENS[18] unit produced "good relief." Id. See Gross, 785 F.2d at 1166.

Once again, there is no indication that Plaintiff had another appointment for four months, when she returned to Rheumatology. See Tr. 293. In spite of this interval, she rated her pain as a nine. Due to Plaintiff's report of radicular pain and

---

[17] Inflammation of a closed sac or envelope lined with synovial membrane and containing fluid, usually found or formed in areas subject to friction. Stedman's at 280, 282.

[18] transcutaneous electrical nerve stimulation

"frequent injurious falls," the doctor referred her for a magnetic resonance imaging ("MRI") and a neurosurgical evaluation.  Id.

This April 2006 record was the most recent available to the ALJ, see Tr. 7; those that followed during the relevant period, however, do not detract from his decision.[19]  Plaintiff's next visit was again at a four-month interval, but this time, just to be issued a standard cane and instructed on its use.  See Tr. 329.  The record reads:  "Patient did not express any pain during this session."  Id.  She also received instruction on how to strengthen her lower extremity.  Tr. 328.

Plaintiff did not see Redfern again until May 2006; her last visit with him had been in March 2005.  He noted that Plaintiff's study for bone density had been normal.  There was no "Problem Focus" listed.  Plaintiff's only finding on examination was that her right ankle measured one-half centimeter larger than her left (most likely due to a recent lower extremity fracture).

Plaintiff's next appointment, according to Redfern, would be in four months, yet she did not return for eight.  See Tr. 324.  He wrote that Plaintiff requested "a statemnet [sic] of disability," but he advised her that he "felt she could work in an environment of sitting at intervals."[20]  Tr. 325.  Again, her examination was

---

[19]  Evidence considered by the Appeals Council and incorporated into the administrative record must be reviewed by this court in determining whether the Commissioner's final decision is supported by substantial evidence.  Wilkins v. Secretary, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991).

[20]  Unlike in earlier opinions, Redfern offered no additional limitations.

21

unremarkable. Overall, Plaintiff's medical records fail to support her claims of disabling pain, and "'disability' requires more than the mere inability to work without pain." <u>Wall v. Astrue</u>, 561 F.3d 1048, 1068 (10th Cir. 2009) (citation omitted); <u>see also</u> <u>Stuckey v. Sullivan</u>, 881 F.2d 506, 509 (7th Cir. 1989); <u>Dumas v. Schweiker</u>, 712 F.2d 1545, 1552 (2d Cir. 1983).

Added by the ALJ, and unaddressed by Plaintiff, is the ALJ's reasoning that she was "less than truthful about her military service." Tr. 22. <u>See</u> SSR 96-7p, 61 Fed. Reg. at 34486 (a strong indication of credibility is the consistency, both internally and with other information in the case record, of the claimant's statements). In addition to giving conflicting testimony, <u>see</u> Tr. 340-42, Plaintiff described an injury during her 1987-89 enlistment to which she attributed her back condition, Tr. 342. Her medical records, however, state that Plaintiff's "[m]echanism of injury" was "unknown." Tr. 296. On the other hand, one caregiver wrote that Plaintiff had a service-connected knee injury related to a fall, Tr. 288; <u>see also</u> Tr. 312 (attributing 10 percent disability to the alleged knee injury), although Plaintiff's first recorded complaints of knee pain did not occur until March 2003 – seven months after her AOD[21] – and she did not testify as to knee pain. In fact, she attributed her disability to "my back pain and my limitations." Tr. 339.

---

[21] As to each injury, Plaintiff claimed not to have sought medical care during her enlistment. <u>See, e.g.</u>, Tr. 288, 295-96, 342. The official reason for Plaintiff's early discharge, and for 30 percent of her service-connected disability, is depression. <u>See, e.g.</u>, 287, 341.

The ALJ also noted Plaintiff's testimony that "she did not apply for disability until she went to a Veterans Administration physician who told her 'how bad' her back was." Tr. 22. But a mere diagnosis of a condition is not enough to prove disability. See Gross, 785 F.2d at 1165-66. The record contains no evidence that Plaintiff stopped working because she could not perform sedentary work. One job ended because of her return to North Carolina, Tr. 80, and another because her shift was discontinued, Tr. 81. Plaintiff claimed to have stopped working in July 2004 because she "was laid off." Tr. 60. Before she was "dismissed," Plaintiff was even enrolled at a police academy – eight months *after* her AOD! Tr. 288; see also Tr. 104. Yet Plaintiff stated on her Disability Report that she quit her jobs because of her back pain. Tr. 104.

Moreover, the ALJ's hypothetical to the VE encompassed all of Plaintiff's alleged restrictions, and the VE still responded with a significant number of jobs with which to satisfy the Commissioner's step five burden. See Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989) (for a VE's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments). Hence, "Although specific delineations of credibility findings are preferable, an ALJ's arguable deficiency in opinion-writing technique does not require us to set aside a finding that is supported by substantial evidence." Carlson v. Chater, 74 F.3d 869 (8th Cir. 1996) (quotations omitted). Accordingly, since the ALJ's credibility finding is amply supported, the court will not remand on this basis.

23

4.  RFC

Social Security Ruling 96-4p, 61 Fed. Reg. 34488-01, explains that:

Once the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the pain or other symptoms alleged has been established on the basis of medical signs and laboratory findings, allegations about the intensity and persistence of the symptoms must be considered with the objective medical abnormalities, and all other evidence in the case record, in evaluating the functionally limiting effects of the impairment(s).

Id. at 34489.  The ALJ here, of course, determined that Plaintiff's allegations about her pain were not due full credibility.  The ALJ also discussed Plaintiff's relatively sparse medical records, with their minimal examination findings.[22]  As a result, he determined that Plaintiff could perform sedentary work.

Plaintiff complains that the ALJ erred in that he did not discuss her ability to sustain work activities in an ordinary work setting on a regular and continuing basis. She fails, however, to suggest why the ALJ is so required.  The court is aware that Ruling 96-8p, 61 Fed. Reg. 34474, counsels that, "[i]n assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)[.]"  Id. at 34478 (footnote omitted). There is no requirement, however, that the ALJ make "a specific finding that the claimant can maintain employment."  Dunbar v. Barnhart, 330 F.3d 670, 672 (5th Cir.

---

[22]  Although Plaintiff mentions that VAMC records are generally summary, the court notes that the caregivers do sometimes record negative, along with the positive, findings.

24

2003). "Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment.[23] <u>Frank v. Barnhart</u> 326 F.3d 618, 619 (5th Cir. 2003).

Plaintiff also alleges that the ALJ erred in that he failed to perform a function-by-function analysis of each of the seven strength demands as suggested by Ruling 96-8p. The Ruling provides that the adjudicator must "describe the maximum amount of each work-related activity the individual can perform *based on the evidence available in the case record*." 61 Fed. Reg. at 34478 (emphasis added). An earlier provision in the Ruling places an even finer point on the issue: "When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." <u>Id.</u> at 34475.

Consequently, it has been held that "[t]his requirement does not require a detailed function-by-function analysis that Claimant urges. Only if the ALJ found that Claimant's [functional ability] was compromised would the burden of discussion fall on the ALJ." <u>Lewis v. Astrue</u>, 518 F. Supp. 2d 1031, 1043 (N.D. Ill. 2007). <u>See also</u>

---

[23] The court does recognize that there is an exception when the claimant's records suggest that he experiences remissions with an impairment that is generally disabling or symptoms that are intermittently disabling. <u>See, e.g.</u>, <u>Frank v. Barnhart</u>, 326 F.3d 618, 619 (5th Cir. 2003) (requiring the ALJ to make a specific finding regarding the claimant's ability to maintain employment when "the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms"). Plaintiff's situation here does not match this scenario.

Banks v. Astrue, 537 F. Supp. 2d 75, 85 (D.D.C. 2008) (finding that SSR 96-8p "does not require written articulation of all seven strength demands"). This issue apparently has not been addressed in the Fourth Circuit, but in the Ninth Circuit, "Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary." Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) (citing SSR 96-8p). So although the ALJ assesses the claimant's RFC "based on the evidence available in the case record," that evidence includes Plaintiff's own description of her pain and limitations, which the ALJ here considered and found not to be fully credible.

Under the Ruling, an individual's "exertional capacity" addresses "seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling." 61 Fed. Reg. at 34477. The ALJ first discussed several of Plaintiff's pertinent medical records. See Tr. 19-22. As to her severe impairments, in August 2002, Plaintiff placed her back pain at a three on a ten-point scale. Tr. 19. X-rays revealed severe degenerative changes of the lumbar spine but with preservation of the L4-5 disk space. Tr. 20.

In follow-up, Plaintiff underwent a computed tomography scan of the lumbar spine which revealed a huge osteophyte at the L5-S1 level, but arising from the facet joint on the *right* side, which was not the side of Plaintiff's pain. Id. There were also osteophytes arising from the facet joints on the left side, at L4-5, but these were mild.

26

Plaintiff's next visit was in November 2002.  Id.  The ALJ noted Plaintiff's sole symptom on examination, tenderness, and that the doctor diagnosed her with myofascial-type pain.  Plaintiff returned to the doctor in March 2003,[24] for evaluation of occasional right leg numbness and with complaints of right knee pain and more back pain.  Tr. 199; see also Tr. 20.

The ALJ next discussed Plaintiff's treatment at the VAMC in North Carolina beginning in June 2004.  Id.  Plaintiff complained of some distal paresthesias in her feet, particularly on the right.  Lumbar spine x-rays showed significant degenerative changes at multiple levels, associated with a significant dextroscoliosis; Plaintiff, however, was taking only Naprosyn for her DDD.  An MRI of her right knee (performed in August 2003) showed just minimal effusion, with the medial tibiofemoral joint space moderately narrowed but only mild loss of articular cartilage.  Tr. 179; see also Tr. 20.  The ALJ added, "The claimant reported worsening pain and falls secondary to weakness.  Another MRI scan was performed on February 24, 2006, which again revealed multilevel degenerative changes associated with scoliosis.  The most severe changes were seen at the L3-4 and L4-5 levels."  Tr. 20 (citing Exh. 8F[25]).

---

[24]  The ALJ mistakenly dated this visit as December 3, 2002.  See Tr. 20.

[25]  There is no corresponding Exhibit in the transcript, as Plaintiff acknowledges.  See Pl.'s Br. at 5.

27

The ALJ also noted Plaintiff's testimony that she had numbness and stiffness in her legs, with radiation into her knee and foot. Tr. 22. Plaintiff also testified that she could sit no more than thirty minutes, stand no more than five minutes, or walk for more than ten to twenty minutes before having pain. According to Plaintiff, her knee gives out and causes her to fall. The ALJ, however (as discussed hereinabove), found that Plaintiff's statements concerning her symptoms were not entirely credible.

The ALJ specifically found that Plaintiff's scoliosis and DDD limited her to lifting no more than ten pounds at a time. Id. He added that Plaintiff had failed to establish that she was unable to occasionally lift and carry such weight; sit approximately six hours of an eight-hour workday; or walk or stand no more than two hours in an eight-hour workday. Id. Although the ALJ did not address Plaintiff's ability to push and pull, the record does not indicate that either was an issue for Plaintiff as it contains neither complaint from Plaintiff nor suggested restriction by her caregivers. The absence of such a limitation is supported by the state agency experts' opinion that Plaintiff was not so restricted. See Tr. 135, 178.

Thus, consistent with Ruling 96-8p, the ALJ discussed the objective medical evidence and Plaintiff's symptoms, and tailored his RFC accordingly. Therefore, the ALJ's RFC analysis was proper, and the court finds that the ALJ complied with the Ruling's instruction to perform the RFC assessment based on the evidence available in the case record.

28

In her argument, Plaintiff specifically focuses on her caregivers' opinions that she is limited in her ability to sit. She claims that there is no evidence to support a finding that she can sit six hours in an eight hour day. But the burden of proof here is on Plaintiff, not the Commissioner. See, e.g., Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (the applicant bears the burden of production and proof during the first four steps of the inquiry). Further, Dr. Griffith (who saw Plaintiff only once) opined that she could not engage in prolonged sitting "[a]t that time." Redfern (not an "acceptable medical source") opined only that Plaintiff could not perform sitting exceeding forty-five minutes *at a time*; he did not address Plaintiff's ability to sit during an eight-hour day. And "[t]he regulations do not mandate the presumption that all sedentary jobs . . . require the worker to sit without moving for six hours[.]"). Halloran v. Barnhart, 362 F.3d 28,33 (2nd Cir. 2004). Finally, as discussed above, such alleged error would not have harmed Plaintiff, as the ALJ could have relied on the VE's testimony listing jobs that a claimant so limited can perform. Again, the court finds no reversible error.

## Conclusion and Recommendation

For the foregoing reasons, the decision of the Commissioner is supported by substantial evidence, and the correct legal principles were applied. Therefore, **IT IS RECOMMENDED** that the Commissioner's decision finding no disability be **AFFIRMED**. To this extent, Plaintiff's motion for summary judgment (docket no. 7) seeking a reversal of the Commissioner's decision should be **DENIED**, Defendant's

motion for judgment on the pleadings (docket no. 10) should be **GRANTED**, and this

action should be **DISMISSED** with prejudice.

_____

WALLACE W. DIXON
United States Magistrate Judge

July 31, 2009